Kenneth L. MAYNARD

v.

NARRAGANSETT INDIAN TRIBE.

Civ. A. No. 92–0122 P.

United States District Court,
D. Rhode Island.

Aug. 10, 1992.

W. Mark Russo, Adler, Pollock & Sheehan, Providence, R.I., for plaintiff.

John F. Killoy, Wakefield, R.I., for defendant.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

The Narragansett Indian Tribe ("Tribe") moves this Court to dismiss the above-captioned case for lack of subject matter jurisdiction. Because the Tribe has limited sovereign immunity as a federally acknowledged and recognized Indian tribe, the Court grants its motion and dismisses the action.

### I. FACTUAL BACKGROUND

Plaintiff Maynard owns land in Charlestown, Rhode Island that abuts the Narragansett Indian Reservation. The Tribe acquired its reservation in 1978 through negotiations with the state and the passage of several state statutes. *See* R.I.Gen. Laws §§ 37–18–1 to 37–18–15. The Tribe was federally acknowledged and recognized in 1983. *See* 25 CFR § 83.11; 48 Fed.Reg. 6177–78 (1983). The First Circuit acknowledged the Tribe's federal status in *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 5 (1st Cir.1991). *See also Town of Charlestown v. United States,* 696 F.Supp. 800, 805 (D.R.I.1988), *aff'd without op.,* 873 F.2d 1433 (1st Cir.1989); *Narragansett Indian Tribe v. RIBO, Inc.,* 686 F.Supp. 48, 49 (D.R.I.1988).

In 1987, Maynard took steps to construct a ninety unit condominium complex on his land. He applied for and received all relevant municipal and state regulatory approvals and permits. Although the Tribe took no action during the administrative stages of the permit and approval application process, it filed suit in federal court alleging various violations of tribal rights. That suit, *Narragansett Indian Tribe v. Maynard,* C.A. No. 90–0345T, was dismissed with prejudice on September 4, 1991.

The dispute between the two parties has now taken a different tack. Maynard instigated this action in Rhode Island state court, alleging that members of the Tribe had been patrolling his property, accosting his invitees, declaring those individuals to be trespassers, and removing them from the property with threats of physical harm. Rhode Island Superior Court granted, *ex parte,* Maynard's Motion for Preliminary Injunction on February 18, 1992. The Tribe successfully petitioned for removal of the action to federal court. This Court denied plaintiff's Motion to Remand pursuant to 28 U.S.C. § 1447(c) on May 7, 1992. The Tribe now moves to dismiss the action for lack of subject matter jurisdiction.

### II. LEGAL BACKGROUND

#### A. *Federally Acknowledged/Recognized Tribes and Sovereign Immunity*

The Narragansett Indian Tribe became a federally acknowledged tribe in 1983. Federal recognition brings with it certain specific rights and privileges.

> Upon final determination that the petitioner is an Indian tribe, the tribe shall be eligible for services and benefits from the Federal Government available to other federally recognized tribes and entitled to the privileges and immunities available to other federally recognized tribes by virtue of their status as Indian tribes with a *government-to-government relationship to the United States* as well as having the responsibilities and obligations of such tribes. Acknowledgement shall subject such Indian tribes to the same authority of Congress and the United States to which other federally acknowledged tribes are subject.

25 CFR § 83.11(a) (emphasis added). As a federally recognized tribe, the Narragan-

sett Indian Tribe argues that its sovereignty renders it immune to unconsented suit.

■ Early in the history of our country, the Supreme Court recognized the sovereignty of the Indian nations. "Indian tribes are distinct, independent political communities, retaining their original natural rights." *Worcester v. Georgia*, 6 Pet. 515, 559, 8 L.Ed. 483 (1832). This sovereignty has translated into immunity from unconsented suit.

Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers. *Turner v. United States*, 248 U.S. 354, 358, 39 S.Ct. 109, 110, 63 L.Ed. 291 (1919); *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 512–513, 60 S.Ct. 653, 656, 84 L.Ed. 894 (1940); *Puyallup Tribe, Inc. v. Washington Dep't of Game*, 433 U.S. 165, 172–173, 97 S.Ct. 2616, 2620–2621, 53 L.Ed.2d 667 (1977). This aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress. But "without congressional authorization," the "Indian Nations are exempt from suit." *United States Fidelity & Guaranty Co.*, supra, 309 U.S. at 512, 60 S.Ct. at 656.

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978). A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976) (citations omitted).

In *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991), the Supreme Court refused to narrow the doctrine of sovereign immunity. "Congress has always been at liberty to dispense with such tribal immunity or to limit it. Although Congress has occasionally authorized limited classes of suits against Indian tribes ... Congress

has consistently reiterated its approval of the immunity doctrine. Under these circumstances, we are not disposed to modify the long-established principle of sovereign immunity." *Id.* 498 U.S. at ——, 111 S.Ct. at 909–10.

■ In short, "Indian tribes and their governing bodies possess common-law immunity from suit. They may not be sued absent express and unequivocal waiver of immunity by the tribe or abrogation of tribal immunity by Congress." *Burlington Northern R.R. Co. v. Blackfeet Tribe*, 924 F.2d 899, 901 (9th Cir.1991).[1]

### B. *Sovereign Immunity and 25 U.S.C. § 1708*

Plaintiff argues that sovereign immunity has, in fact, been expressly waived. This argument hangs entirely on the course of events leading to the creation of the reservation and federal tribal recognition.

In 1975, the Tribe filed two actions in federal court claiming approximately 3,200 acres of land in Charlestown, Rhode Island. These actions were settled in 1978 through the Narragansett Indian Land Claims Settlement Agreement. Pursuant to the agreement, the State of Rhode Island deeded approximately 900 acres of public land to the Tribe, and the Federal government purchased an additional 900 acres of private land on behalf of the Tribe. In order to implement this agreement, state and federal legislatures passed two statutes. Congress passed the Rhode Island Indian Claims Settlement Act, 25 U.S.C. § 1701 *et seq.;* Rhode Island passed the Narragansett Indian Land Management Corporation Act, R.I.Gen.L. § 37–18–1 *et seq.*

It is in this hodge-podge of overlapping state and federal statutes that plaintiff finds the alleged express waiver of com-

---

1. The extent of tribal sovereign immunity is not affected by the type of remedy—monetary, declaratory, or injunctive—sought. *Hardin v. White Mountain Apache Tribe*, 779 F.2d 476, 478 (9th Cir.1985) (suit for declaratory and injunctive relief, as well as damages, barred by tribal

immunity); *Chemehuevi Indian Tribe v. California State Bd. of Equalization*, 757 F.2d 1047, 1052 n. 66 (9th Cir.), *rev'd in part on other grounds*, 474 U.S. 9, 106 S.Ct. 289, 88 L.Ed.2d 9 (1985).

mon law tribal sovereign immunity. 25 U.S.C. § 1708 states:

> Except as otherwise provided in this subchapter, the settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island.

This provision, plaintiff argues, represents Congress' express abrogation of the Tribe's sovereign immunity.

The Tribe has three responses to this argument. (1) Section 1708 was passed five years prior to federal recognition of the Tribe. Upon federal recognition, the Tribe became immune from suit, and § 1708 no longer applied to the Tribe. (2) Because § 1708 did not deprive the future federally recognized Tribe of its civil regulatory powers, it cannot be read so broadly as to abrogate its immunity. (3) Even if the Tribe's immunity has been abrogated, Congress has never taken the other necessary step to grant the State courts jurisdiction over the now federally recognized Narragansett Tribe.

■■■ When evaluating these arguments, it is important to remember the applicable canon of construction for statutes involving Indians. "[S]tatutes passed for the benefit of dependent Indian tribes ... are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976) (citations omitted). It is also imperative to focus on the nature of this lawsuit. Plaintiff has sued the *Tribe*. The discussion of jurisdiction hangs on the all important distinction between Indians as individuals and Indians as a tribe. Bringing suit against the Tribe mimics an action against the United States government. It is for this reason that the Court engages in the ensuing questions of sovereign immunity.

## III. DISCUSSION

### A. *Section 1708, at most, confers jurisdiction only over the settlement lands.*

■■■ Section 1708 speaks in general terms of state jurisdiction over "settlement lands." The Tribe argues that any applicability § 1708 had over these lands disappeared when the Tribe gained federal recognition.[2] It is unnecessary to address these time-frame arguments. Jurisdiction over tribal lands simply does not confer jurisdiction over the tribe itself.[3] In *Long v. Chemehuevi Indian Reservation*, 115 Cal.App.3d 853, 171 Cal.Rptr. 733, *cert. denied*, 454 U.S. 831, 102 S.Ct. 129, 70 L.Ed.2d 109 (1981), a California state court addressed the interplay of sovereign immunity and 28 U.S.C. § 1360 (Public Law 280), a statute which gave certain states civil jurisdiction over actions involving Indians or occurring on Indian land. The court concluded that this statute, much more explicit than the statute concerning the Narragansett Tribe, did not waive the sovereign immunity of the tribe itself. "Congress, in passing 28 U.S.C. § 1360, could have easily expressed its intent to grant the listed states complete jurisdiction over its resident tribes. Congress' failure to so act must be read as a purposeful decision...." *Id.* 115 Cal.App.3d at 858, 171 Cal.Rptr. 733.

A Florida state court reached a similar conclusion in *Seminole Tribe of Florida v. Houghtaling*, 589 So.2d 1030 (Fla.Dist.Ct.App.1991). Again concerned with 28 U.S.C. § 1360, the court held that tribal sovereign immunity was not abrogated by giving the state jurisdiction over individual Indian or Indian land. Finally, in *Califor-*

---

**2.** Congress enacted § 1708 in 1978, five years before it federally recognized the Narragansett Indian Tribe.

**3.** The interplay between tribal, state, and federal law as applied to Indians or Indian reservations is complex. Each fact pattern must be individually examined to correctly assign jurisdiction. The Court makes no attempt to provide an exegesis on the subject. Section 1708 purports to give the state jurisdiction over settlement lands. The parameters of this jurisdictional grant are vague; the Tribe believes this entire section is moot. However, an example may be helpful. While the Court holds that § 1708 does not give jurisdiction over the Tribe *qua* tribe, it is fair to say that the state would have jurisdiction over a murder committed on Indian (settlement) land.

*nia v. Quechan Tribe of Indians*, 595 F.2d 1153 (9th Cir.1979), the Ninth Circuit refused to imply a waiver of tribal sovereign immunity from 18 U.S.C. § 1162 (also part of Public Law 280), a statute granting state criminal jurisdiction over Indians and Indian country.

Plaintiff contends that "[t]o deny Maynard redress in the Rhode Island court system upon the facts at bar, wherein Tribal members have left Settlement Lands and trespassed upon private property in the name of the Tribe, would be an injustice...." Pltf's Obj. to Def's Motion to Dismiss at 5. Maynard has brought suit against the Tribe itself, not against individual tribal members. Maynard chose to challenge a sovereign government, not its individual citizens, and it is this fact which prevents his suit from continuing.

■ The Tribe claims that § 1708 has *no* present application. The Court need not go that far; indeed, it would be improper for the Court to engage in a complete analysis of the jurisdictional grant found in § 1708. Such an analysis would constitute mere dicta. However, it is clear that § 1708 does not waive or abrogate the Tribe's sovereign immunity. Any waiver or abrogation of sovereign immunity must be expressly and clearly stated; § 1708 does not contain such a waiver.

Moreover, Congress clearly knows how to write a statute that abrogates sovereign immunity. In 1980, Congress passed the Maine Indian Claims Settlement Act, 25 U.S.C. § 1721 *et seq.* The Maine Act expressly gives the state jurisdiction over both the *tribes* and *their lands.* 25 U.S.C. § 1725. The Maine Act clearly spells out all the jurisdictional questions left open in Rhode Island by § 1708. Similarly, the Massachusetts Indian Claims Settlement Act, 25 U.S.C. § 1771 *et seq.* explicitly abrogates the Wampanoag Tribal Council's jurisdiction over the civil regulatory and criminal laws of the town and state. Section 1708 mentions neither civil regulatory nor, more importantly, tribal jurisdiction.

**B.** *Section 1708 does not abrogate the Tribe's civil regulatory powers. Although this fact does not directly bear on the question of jurisdiction, it provides a lens through which to view the problem.*

Plaintiff believes that the plain language of § 1708 completely resolves the question of state jurisdiction. It does not. Jurisdiction over Indians and Indian reservations has evolved in a tangled manner. In certain situations, the application of state law depends on whether the law is prohibitory or regulatory in nature. To understand this dichotomy, a small slice from the history of Federal Indian law must be presented.

It should be noted that the following discussion does not directly bear on the issue of sovereign immunity; as discussed above, the Court holds that § 1708 does not explicitly abrogate tribal sovereign immunity. The previous discussion amply supports the Court's holding. However, plaintiff's argument advanced what could best be described as a "plain language" theory. To illustrate the problems with this approach, the Court offers the following section.

### 1. *Public Law 280*

Public Law 280, enacted in 1953, gave certain states limited jurisdiction over certain Indian reservations. It initially applied only to five states and placed most tribes in those states under civil and criminal state law and jurisdiction. 18 U.S.C. § 1162; 28 U.S.C. § 1360. Public Law 280 provided:

> jurisdiction over civil causes of action between Indians or to which Indians are parties ... to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State....

28 U.S.C. § 1360(a).

While this language seemed sweeping, the Supreme Court, in *Bryan v. Itasca*

*County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), held that Public Law 280 merely opened state courts to Indians and allowed state rules of decision to be applicable in such suits. The Court stated the Public Law 280 was not enacted to subordinate Indian tribes "to the full panoply of civil regulatory powers, including taxation, of state and local government." *Id.* at 388, 96 S.Ct. at 2111.

The Supreme Court further delineated the dichotomy in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). The Court stated:

> When a State seeks to enforce a law within an Indian reservation under the authority of Pub.L. 280, it must be determined whether the law is criminal in nature, and thus fully applicable to the reservation under § 2, or civil in nature, and applicable only as it may be relevant to private civil litigation in state court.

*Id.* at 208, 107 S.Ct. at 1088. Although the Supreme Court refused to characterize this dichotomy as a "bright-line rule," the regulatory/prohibitory issue provides an important distinction when confronting questions of jurisdiction.

### 2. *Section 1708*

■ With this background in mind, the Court turns to § 1708. Compared to the language of Public Law 280, § 1708 is even more generalized. By comparing § 1708 with Public Law 280, the Court concludes that § 1708 does not abrogate the Tribe's civil regulatory powers.

Further support for this position is found in what Congress did not enact. Section 1708 was enacted in lieu of a similar provision contained in a Joint Memorandum of Understanding Concerning Settlement of the Rhode Island Indian Land Claims ("MOU"). The MOU stated:

> except as otherwise specified in this Memorandum, all laws of the State of Rhode Island shall be in full force and effect on the Settlement lands, including but not limited to state and local buildings, fire and safety codes.

MOU, paragraph 13. As is obvious, this paragraph included regulatory laws, a provision absent in § 1708. Section 1708, as enacted, subjected the settlement lands to state criminal and civil laws—not *all* laws as the language of the MOU stated. In the area of Indian law and jurisdiction, this is a difference with a great distinction. If the state's criminal and civil law constituted all of the laws of Rhode Island, § 1708 would have adopted the language of the MOU. Since it did not, there must be some laws which do not apply to the settlement lands. The *Bryan/Cabazon Band* holdings explain that it is civil regulatory state law which is inapplicable.

As stated above, this discussion does not directly address the issue of jurisdiction. It is, however, important for two reasons. First, if § 1708 does not abrogate the tribe civil regulatory powers, it seems a stretch for plaintiff to argue that it abrogates the tribe's sovereign immunity—a much more important power for the Tribe. If the state's civil regulatory power cannot pierce the boundaries of the reservation, it follows that the Tribe's sovereign immunity is also inviolate.

■ Second, the analysis of Public Law 280 and the discussion of the regulatory/prohibitory dichotomy illustrates a very important aspect of Indian law—the specificity with which statutes must be written, read, and interpreted. Section 1708 does not explicitly and unequivocally abrogate the applicability of tribal sovereign immunity. As the cases concerning Public Law 280 amply show, such specificity is required in any area involving the jurisdictional triangle between federal, state, and tribal laws.

### IV. CONCLUSION

■ As a sovereign entity with a government-to-government relationship to the United States, the Narragansett Indian Tribe retains common law sovereign immunity unless specifically waived by the Tribe or abrogated by the United States Congress. Neither course of action has oc-

curred.[4] This being the case, the Court does not have subject matter jurisdiction over the Narragansett Indian Tribe.[5] Defendant's motion is granted; the case is dismissed.

SO ORDERED.

---

4. The Court has not seen a copy of the Tribal Constitution or charter, nor is the Court aware that such a document even exists. Waiver of sovereign immunity—a "sue or be sued" clause—could be contained in this type of document. Plaintiff has presented no evidence from a constitution or charter, and defendant has never mentioned this sort of waiver. The Court has ruled presuming no such clause ex-

ists. The provision found in the Narragansett Indian Land Management Corporation Act no longer applies to the federally recognized tribe.

5. Defendant also alleged deficiencies in notice and service of process. As the case is dismissed due to lack of subject matter jurisdiction, the Court will not address these allegations.