The WAMPANOAG TRIBE OF GAY HEAD (AQUINNAH), Plaintiff,

v.

**MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION, Charles E. Walker, an individual and Commissioner of the Massachusetts Commission Against Discrimination, and Barbette A. Warren, an individual, Defendants.**

**No. Civ.A. 98–12413–RCL.**

United States District Court, D. Massachusetts.

Sept. 7, 1999.

plaintiff does not oppose the entry of summary judgment.

Michael C. Gilman, Holtz & Gilman, Boston, MA, Conly J. Schulte, Monteau, Peebles, Evans & Marks, L.L.P., Omaha, NE, for plaintiff.

Jane L. Willoughby, Attorney Generals Office Government Bureau, Boston, MA, Douglas H. Wilkins, Attorney General's Office, Boston, MA, for defendants.

Nadine Cohen, Law Office of Sherwin L. Kantrovitz, Boston, MA, for defendant Barbette A. Warren.

## MEMORANDUM AND ORDER ON PLAINTIFF'S REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF

LINDSAY, District Judge.

The Wampanoag Tribal Council of Gay Head, Inc. ("Tribe"), a federally recognized tribe of Native Americans, has brought this action for declaratory and injunctive relief against the Massachusetts Commission Against Discrimination ("MCAD"); Charles E. Walker, in his individual capacity and in his capacity as a commissioner of the MCAD; and Barbette A. Warren, an individual. In general, the Tribe seeks a judgment, pursuant to 28 U.S.C. § 2202, declaring that the MCAD lacks jurisdiction over the Tribe in administrative actions pending before the MCAD and arising from claims of unlawful employment discrimination made by Warren. The Tribe also seeks an injunction prohibiting the defendants from prosecuting Warren's claims; and, in the case of the MCAD and Walker, the Tribe seeks an injunction prohibiting those defendants from asserting jurisdiction over the Tribe in the proceedings pending before the MCAD. The Tribe has invoked the court's original jurisdiction, under 28 U.S.C. § 1362, to hear civil actions brought by a federally recognized tribe of Native Americans.

The Tribe seeks a judgment declaring four propositions: (1) that the Tribe is immune from the actions brought by Warren pending before the MCAD; (2) that the Tribe's inherent and federal rights of self government prevent the exercise of jurisdiction over the Tribe by the MCAD in the current administrative proceedings; (3) that the defendants, under color of state law, have subjected the Tribe to the deprivation of rights, privileges and immunities secured by the Constitution and federal laws; and (4) that the Massachusetts employment discrimination law, Mass. Gen. Laws ch. 151B, is preempted, as to the Tribe, by the Indian Self–Determination and Education Assistance Act, 25

U.S.C. §§ 450–458e ("ISDA"). In addition, as noted above, the Tribe requests, with respect to each requested declaration, that the court enter a permanent injunction preventing the defendants from proceeding with any action upon Warren's discrimination claims before the MCAD.

The Tribe filed a motion for a temporary restraining order and preliminary injunction shortly after this action was commenced. Thereafter, the parties agreed to consolidate the Tribe's motion for preliminary relief with a hearing on the merits of the Tribe's claims. To this end, the parties filed a stipulation of facts setting forth their agreement as to the facts necessary for the court's resolution of this matter.

## I. Background of the Tribe[1]

In 1974, the Tribe sued the Town of Gay Head in this district, claiming that certain transfers of tribal lands violated the Indian Non–Intercourse Act, 25 U.S.C. § 177.[2] The parties eventually entered into an agreement called The Memorandum of Understanding Concerning Settlement of the Gay Head, Massachusetts Indian Land Claims ("Joint Memorandum"). The Joint Memorandum settled the pending lawsuit and set forth the framework for prospective relations among the Commonwealth of Massachusetts, the Town of Gay Head, and the Tribe. In 1985, the Massachusetts Legislature enacted legislation implementing the terms of the Joint Memorandum. 1985 Mass. Acts 277 ("Massachusetts Implementing Act").

During the pendency of the litigation, the Tribe petitioned for federal recognition of its existence as a Native American tribe. On February 10, 1987, the Secretary of Interior responded favorably and extended federal recognition. Final Determination for Federal Acknowledgment of the Wampanoag Tribal Council of Gay Head, Inc., 52 Fed.Reg. 4193 (1987)[3]. Thereafter, on August 18, 1987, Congress enacted the Massachusetts Settlement Act in order to settle the land claims of the Tribe. Under the Settlement Act, Congress ratified and confirmed the existence of the Tribe as an Indian tribe "with a government to government relationship with the United States." 25 U.S.C. § 1771(7).

## II. Factual and Procedural Background of the Case[4]

Warren is a non-Native American who was hired by the Tribe in July 1992 as an assistant youth services coordinator. Thereafter, she held various other positions with the Tribe, including employment and training coordinator and administrative assistant to the director of economic development trust services. On July 10, 1996, Warren applied for the position of tribal education director. The tribal education director is a key educational administrator, program planner and developer of all of the Tribe's educational programs. The position of tribal education director is a function of tribal government administered by the Tribe on behalf of the United States, pursuant to a so-called self-determination contract between the Tribe and

1. The following background is extracted from H.R.Rep. No. 100–238, at 2–3 (1987), the report on H.R. 2855, which was later enacted as the Massachusetts Indian Land Claims Settlement Act, 25 U.S.C. §§ 1771–1726 ("Massachusetts Settlement Act"), from the congressional findings and policy set forth in the Massachusetts Settlement Act itself, and from the parties' stipulation of facts.

2. At the time of this lawsuit, the Tribe was incorporated under Massachusetts law, but was not then recognized by the Secretary of the Interior as a Native American Tribe.

3. Recognition was given to the incorporated entity, the Wampanoag Tribal Council of Gay

Head, Inc., the entity to which the court has referred, and will continue to refer, in this memorandum and order as the "Tribe." The Tribe is governed by a smaller group of eleven members called the "Tribal Council." Constitution of the Wampanoag Tribe of Gay Head (Aquinnah) art. I, § 5; art. IV.

4. This summary of the facts is drawn from the parties' stipulation and otherwise from the factual record before the court. Unless stated here as allegations, views or contentions of one party or the other, these facts are not disputed.

the Department of Interior's Bureau of Indian Affairs. The self-determination contract was entered into pursuant to ISDA on January 25, 1996.

Warren was interviewed for the position of tribal education director by a five-member committee. The job, however, was not offered to her. Instead, the Tribe decided to advertise the position in an effort to attract a Native American. Warren claims that a qualified Native person applied for the job, but was not hired. Ultimately, the Tribe appointed a non-Native American as its tribal education director.

On August 7, 1996, Warren filed a charge against the Tribe with the MCAD, pursuant to Mass. Gen. Laws ch. 151B, alleging that the Tribe discriminated against her on the basis of race in its denial of her promotion to tribal education director. In her MCAD charge, Warren stated that the Tribe's personnel director informed her that "the reason [she was not hired] was that [she] was a non-Native American." Stipulation, Exh. K.

On April 8, 1997, an article appeared in the *Boston Globe* reporting Warren's employment dispute with the Tribe. The article also contained references to and quotes from the minutes of the Tribe's Gaming Committee. The Tribe maintains that the minutes of its Gaming Committee are confidential. Warren asserts that she provided those minutes to the MCAD in support of her claim of discrimination, but that she did not submit any information to the *Boston Globe*. On April 8, 1997, the Tribe terminated Warren from the posi-

tion she then held as administrative assistant to the director of economic development trust resources. The Tribe gave as a reason that Warren had made public sensitive, confidential tribal government information. Warren then filed a second complaint with the MCAD, alleging that her discharge was in retaliation for the filing of her original discrimination claim.

On February 25, 1997, the Tribe moved that the MCAD dismiss Warren's original discrimination charge on the basis that the MCAD lacked subject matter jurisdiction. The Tribe asserted that Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b), exempts Native American tribes from coverage under Title VII. The MCAD denied the Tribe's motion to dismiss. On February 13, 1998, the MCAD issued a finding of probable cause with respect to each of Warren's pending administrative charges. Thereafter, the Tribe filed a motion seeking reconsideration of the earlier denial of the Tribe's motion to dismiss. In the motion for reconsideration, the Tribe asserted that the MCAD's jurisdiction over the Tribe was precluded by tribal sovereign immunity, by the tribal right of self-government, and that Mass.Gen. Laws ch. 151B (under which Warren's discrimination charges were brought) was preempted by ISDA, with respect to the Tribe.[5] This motion was orally denied on September 18, 1998.

On or about November 25, 1998, the Tribe filed the present complaint in this court. The MCAD and Walker agreed to stay the administrative proceedings at the

---

5. The centerpiece of ISDA involves the grant of federal funds to qualifying Native American organizations for programs that are planned and administered by the tribes themselves. This is accomplished, under the statute, through the "self-determination contract" whereby the federal government contracts with a tribal organization to plan, conduct, and administer programs, functions, services, or activities for the benefit of Native Americans because of their status as Native Americans. *See* 25 U.S.C. § 450f. ISDA expressly mandates preference requirements for Native Americans in training and employment under

for programs administered under a self-determination contract or other federal grants to a Native American tribe:

Any contract, subcontract, grant or subgrant pursuant to this subchapter ... or any other Act authorizing Federal contracts with or grants to Indian organizations or for the benefit of Indians, *shall require* that to the greatest extent feasible—
(1) *preferences and opportunities for training and employment* in connection with the administration of such contracts or grants shall be given to Indians;
25 U.S.C. § 450e(b) (emphasis added).

MCAD, pending resolution of this action. This court held a hearing on June 14, 1999 and, in a ruling from the bench, dismissed the MCAD from the present action on the ground that the Eleventh Amendment to the United States Constitution bars the Tribe's suit against that agency.

For the reasons set forth below, the plaintiff's request for declaratory and injunctive relief is GRANTED.

### III. Discussion

■ It has been long established that tribes of Native people, recognized as such by the United States, enjoy an inherent sovereignty. *See Maynard v. Narragansett Indian Tribe,* 798 F.Supp. 94, 96 (D.R.I.1992), *aff'd,* 984 F.2d 14 (1st Cir. 1993). As the Supreme Court said in *Worcester v. Georgia:* "Indian tribes are distinct, independent, political communities, retaining their original natural rights." 6 Pet. 515, 559, 8 L.Ed. 483 (1832). This sovereignty "is dependent on, and subordinate to, only the Federal Government, and not the States." *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 207, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) (citation omitted). A well-established corollary to the concept of tribal sovereignty is that tribes of Native Americans enjoy a sovereign's common-law immunity from suit. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) (citations omitted); *United States v. United States Fidelity & Guar. Co.,* 309 U.S. 506, 512, 60 S.Ct. 653, 84 L.Ed. 894 (1940). "As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe v. Manufacturing Tech., Inc.,* 523 U.S. 751, 118 S.Ct. 1700, 1702, 140 L.Ed.2d 981 (1998); *see also Penobscot Nation v. Fellencer,* 164 F.3d 706, 709 (1st Cir.1999).

As *Kiowa Tribe* indicates, the sovereign immunity of a Native American tribe can be waived by the tribe itself, or it may be abrogated by Congress. Abridgment of the immunity, however, "cannot be implied but must be unequivocally expressed." *Santa Clara Pueblo,* 436 U.S. at 58, 98 S.Ct. 1670 (quoting *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)). The question in this case, then, is whether the Tribe's sovereign immunity has been waived or abrogated by Congress. Nothing in the record suggests the kind of unequivocal waiver by the Tribe of its sovereign immunity contemplated by *Santa Clara Pueblo,* and the defendants do not contend otherwise. The question that remains, therefore, is whether Congress has abrogated the Tribe's sovereign immunity.

The defendants argue that Congress annulled the Tribe's sovereign immunity in the enactment of §§ 1771e(a) and 1771g of the Massachusetts Settlement Act. Section 1771e(a) of that statute provides:

(a) Limitation on Indian jurisdiction over settlement lands

The Wampanoag Tribal Council of Gay Head, Inc., shall not have any jurisdiction over nontribal members and shall not exercise any jurisdiction over any part of the settlement lands in contravention of this subchapter, the civil regulatory and criminal laws of the Commonwealth of Massachusetts, the town of Gay Head, Massachusetts, and applicable Federal laws.

25 U.S.C. § 1771e(a). Section 1771g of the Massachusetts Settlement Act provides:

Except as otherwise expressly provided in this subchapter, or in the State Implementing Act, the settlement lands and any other land that may now or hereafter be owned by or held in trust for any Indian tribe or entity in the town of Gay Head, Massachusetts, shall be subject to the civil and criminal laws, ordinances, and jurisdiction of the Commonwealth of Massachusetts and the town of Gay Head, Massachusetts (including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance).

25 U.S.C. § 1771g.

■ The defendants argue that "the plain meaning of [the provisions quoted

above], read together, means that the Tribe has no civil regulatory authority over the settlement lands where it acts in violation of state law. . . . The Tribe therefore has no sovereign power to act in violation of Mass.G.L.ch. 151B in this case." Def.Mem. at 14. As in all cases of statutory construction, congressional intent will control the interpretation to be given the statute in question. *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 586–87, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977). Thus, when a court interprets a statute, "the face of the Act, the surrounding circumstances and the legislative history are to be examined with an eye toward determining what congressional intent was." *Id.* at 587, 97 S.Ct. 1361. But while the usual rules of statutory construction apply in the interpretation of statutes that touch upon tribal sovereignty, the court is obligated to construe "acts diminishing the sovereign rights of Indian tribes . . . strictly," *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 702 (1st Cir.1994), with "doubtful expressions resolved in favor of [the tribes]." *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 174, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973) (citation omitted).

■ Examining the plain terms of the two quoted provisions of the Massachusetts Settlement Act, the court finds nothing that evinces an express and categorical abrogation by Congress of the Tribe's sovereign immunity. Section 1771e(a) of the Massachusetts Settlement Act merely addresses the nature and reach of the Tribe's jurisdiction over members and non-members and over the settlement lands. Section 1771g merely provides in general terms that the settlement lands are subject to state and municipal law and jurisdiction. While these provisions prescribe the limits of the Tribe's jurisdiction over members and non-members of the tribe and over the settlement lands they do not speak to the question of the extent to which Massachusetts may exercise jurisdiction over the Tribe itself. Indeed, these provisions are altogether silent on the question of tribal sovereign immunity. *See, e.g., Maynard v. Narragansett Indian Tribe*, 984 F.2d 14, 16 (1st Cir.1993).

In *Maynard*, the district court examined a similar provision in the Rhode Island Indian Claims Settlement Act, 25 U.S.C. §§ 1701–1716, to determine the Narragansett Tribe's immunity from a suit arising from a property dispute between a private landowner and the Narragansett Tribe. 798 F.Supp. at 97. The relevant provision in the Rhode Island Settlement Act at issue in that case stated: "Except as otherwise provided in this subchapter, the settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island." 25 U.S.C. § 1708. The court began its analysis by emphasizing the "all important distinction between Indians as individuals and Indians as a tribe" in the context of sovereign immunity. *Maynard*, 798 F.Supp. at 97. The court then examined the language of the section in question, noting the general terms with which state jurisdiction over "settlement lands" was discussed, and concluded that the Rhode Island Settlement Act did not contain a clear and express waiver of sovereign immunity such as would indicate an abrogation by Congress of the tribe's sovereign immunity. *Id.* at 98. As the court noted: "Jurisdiction over tribal lands simply does not confer jurisdiction over the tribe itself." *Id.* at 97.

An edifying contrast with the Massachusetts Settlement Act is found in the Maine Indian Claims Settlement Act, 25 U.S.C. §§ 1721–1726 ("Maine Settlement Act"). Congress enacted the Maine Settlement Act in 1980 (seven years before it enacted the Massachusetts Settlement Act) to ratify a settlement among the Penobscot Nation, the Passamaquoddy Tribe and the State of Maine of land claims asserted by the tribes, and to set forth the legal status of the Passamaquoddy Tribe, the Penobscot Nation, and the Houlton Band of Maliseet Indians. Section 1725 of the Maine Settlement Act states, in relevant part:

[A]ll Indians, Indian Nations, or tribes or bands of Indians in the State of Maine ... other than the Passamaquoddy Tribe, the Penobscot Nation and their members ... shall be subject to the civil and criminal jurisdiction of the State, the laws of the State, and the civil and criminal jurisdiction of the courts of the State, to the same extent as any other person or land therein.

25 U.S.C. § 1725(a).

The Passamaquoddy Tribe, the Penobscot Nation, the Houlton Band of Maliseet Indians, and all members thereof, and all other Indians, Indian nations, or tribes or bands of Indians in the State of Maine may sue and be sued in the courts of the State of Maine and the United States to the same extent as any other entity or person residing in the State of Maine may sue or be sued in these courts.... *Provided, however,* That the Passamaquoddy Tribe, the Penobscot Nation, and their officers and employees shall be immune from suit to the extent provided in the Maine Implementing Act.

25 U.S.C. § 1725(d)(1) (emphasis in original).

As this statute makes clear, Congress has no difficulty in expressing in plain terms any limitations it intends upon the sovereign immunity of Native American tribes. All of the Native people and tribes governed by the Maine Settlement Act, except those specifically excepted, are expressly made subject to the laws of Maine and to the jurisdiction of its courts.[6] Congress is presumed to have enacted the Massachusetts Settlement Act against the background of the Maine Settlement Act. *See Akins v. Penobscot Nation,* 130 F.3d 482, 489 (1st Cir.1997). Thus, had Congress intended to annul the sovereign immunity of the Tribe involved in this case, Congress, in enacting the Massachusetts Settlement Act, need only have borrowed language from the Maine Settlement Act.

In view of the absence of a clear and unequivocal expression by Congress of an intention to abrogate the sovereign immunity of the Tribe, the court holds that the Tribe retains its traditional sovereign immunity from the exercise by Massachusetts of jurisdiction over the Tribe. In light of the foregoing ruling, it is unnecessary that the court address the Tribe's remaining three claims for declaratory relief.

### III. Conclusion

For the reasons set forth above, the court declares that the Tribe enjoys the immunity of a sovereign from the charges made by Barbette A. Warren and now pending against the Tribe at the MCAD. Accordingly, the defendant Barbette A. Warren and all persons acting in her behalf are enjoined from pursuing, before the MCAD, Warren's claim of employment discrimination. The defendant, Charles E. Walker, and all persons acting in his behalf are enjoined from prosecuting, hearing or deciding any claim of employment discrimination brought by Warren against the Tribe and from otherwise exercising jurisdiction over the Tribe. The clerk shall enter judgment for the Tribe accordingly.

SO ORDERED.

---

6. Even as to the excepted tribes, Maine courts may exercise jurisdiction to the extent provided in the Maine Implementing Act. The Maine Implementing Act, in turn, makes the excepted tribes "subject to all duties, obligations, liabilities and limitations of a municipality of and subject to the laws of the State," but preserves the tribes' sovereignty over internal tribal matters. Me.Rev.Stat.Ann.tit. 30, § 6206(1). *See Fellencer,* 164 F.3d at 707–08; *Houlton Band of Maliseet Indians v. Maine Human Rights Comm'n,* 960 F.Supp. 449, 451–54 (D.Me.1997).